### WALKER v. LAWRENCE.

(Circuit Court of Appeals, Fourth Circuit. February 23, 1910.)

#### No. 908.

CONTRACTS (§ 117*)—LEGALITY—PUBLIC POLICY—AGREEMENT IN PARTIAL RESTRAINT OF TRADE.

An agreement by the seller, on a sale of a liquor business, stock, and good will, that he will not engage in a like business in that or any adjoining county for a period of six years, nor assist any one else in such business, and that he will remove from such territory and maintain his residence elsewhere for five years, is not unlawful as against public pol-·

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

icy, in the absence of proof that it was not a reasonable provision for the protection of the purchaser in the business.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 554–569; Dec. Dig. § 117.*]

In Error to the Circuit Court of the United States for the Southern District of West Virginia, at Charleston.

Action by S. G. Walker against A. C. Lawrence. Judgment *for* defendant, and plaintiff brings error. Reversed.

Wesley Mollohan, W. G. Mathews, and Mollohan, McClintic & Mathews, for plaintiff in error.

W. E. Chilton, H. D. Rummell, Chilton, McCorkle & Chilton, and Rummel & Higginbotham, for defendant in error.

Before PRITCHARD, Circuit Judge, and BRAWLEY and CONNOR, District Judges.

BRAWLEY, District Judge. · This is an action in assumpsit upon four promissory notes, aggregating $9,000, exclusive of interest, dated February 15, 1907, executed by Walker, Lawrence & Co., a corporation, indorsed by Lawrence, the defendant, and delivered to the plaintiff. Afterwards, to wit, April 23, 1907, the plaintiff and defendant, together with said Walker, Lawrence & Co., and one Clark and Watson, made and entered into a certain agreement in writing, duly signed and sealed, whereby all the goods, wares, merchandise, and other property therein set forth, including the notes described, was sold by Lawrence to the plaintiff, who assumed said notes, and agreed to save said Walker, Lawrence & Co. and A. C. Lawrence harmless relative thereto. About two months thereafter, to wit, June 26, 1907, another agreement in writing was made, duly signed and sealed, by all the parties thereto, reciting the contract of April 23d. This last contract is set forth in full in the declaration, and by it it appears that Lawrence, the defendant, bought from Walker, the plaintiff, the business theretofore vested in Walker; Lawrence agreeing to assume payment of the notes and to indorse on them the words: "With interest from July 1, 1907."

· Walker, Lawrence & Co. was a corporation engaged in the wholesale and retail liquor business in Kanawha county, W. Va., and the property described in the agreements consisted of real estate, leases and contracts, bottling house, beer cases, bottles, and horses and wagons, stock of liquors, licenses, book accounts, and bills receivable. The case was heard upon demurrer, which the court sustained, upon the ground that one of the considerations of the contract "is contrary to public policy, to wit, the part thereof wherein the said S. G. Walker agrees to remove from and stay out of the county of Kanawha and adjoining counties, and to refrain from engaging in the liquor business as set forth in said contract," and the judgment of the court was that the action be dismissed. The conclusions reached by us render it unnecessary to consider the first assignment of error, to wit, that "the court erred in requiring profert and granting oyer, over the objection of the plaintiff of the April contract mentioned in the declaration."

The plaintiff, in the contract of June 26, 1907, agreed to sell and convey all of his rights, title, and interest in the property and business described to the defendant and his associates, as follows:

"For the consideration mentioned in this agreement and bill of sale, the said party of the first part does hereby waive and transfer unto the said party of the third part all of the privileges and interests pertaining to the welfare of the parties to this agreement in said business, without any reservation whatsoever, and agrees not to enter into or engage in the wholesale or retail liquor business in the county of Kanawha, West Virginia, for a period of six years from this date, and agrees further that he will not aid any person, firm or corporation, or promote the interest of any person, firm or corporation, now or hereafter engaged in the wholesale or retail liquor business, whose interests may conflict with the interests of the second, third and fourth parties to this agreement, and for the consideration herein mentioned the good-will of the said S. G. Walker in the business herein mentioned is conveyed to the party of the third part, and it is hereby understood that the said S. G. Walker will not do any act, directly or indirectly, to interfere with or which shall in any way be inimical to the said liquor business of the parties of the second, third and fourth parts, whether said business is conducted by the said parties in their individual capacities, or by their assigns or otherwise."

It is further stipulated that:

"If the party of the first part shall engage in the wholesale or retail liquor or beer business, or become interested in any manner whatsoever in any of the said counties of the state of West Virginia, either directly or indirectly, at any time, within the period of six years next succeeding this date, or shall encourage or aid any person, firm or corporation to engage in any business or to do any act, or shall himself do any act, directly or indirectly, to interfere with or which shall in any way be inimical to the business of the said second, third and fourth parties to this agreement, or their assigns or shall by any act or utterance violate any of the provisions of this agreement, he shall pay as liquidated damages to the said party of the third part the sum of $15,-000.00. The $9,000.00 in notes hereinbefore described and required to be deposited with the cashier of the Kanawha Valley Bank, shall be held by the said cashier as above required, until each and all of the said notes mature, and if at any time before or after maturity of any or all of said notes the said party of the first part shall become liable to pay the said $15,000.00 as above set out, then such of the said notes as may be in the hands of said cashier shall be turned over to the party of the third part and the same credited upon the amount of liquidated damages above agreed upon. In default of payment of any of the aforesaid notes by the party of the third part to the party of the first part, as they become due, then in that event, all the notes herein mentioned shall become due and payable on demand."

There is a further stipulation as follows:

"The said S. G. Walker further agrees that he will within sixty days from the date remove from the said territory (consisting of the county of Kanawha and adjoining counties), and for the period of five years next succeeding the date of the agreement, live and reside outside of the said territory; if said Walker does not within sixty days from the date of this agreement remove from the territory aforesaid he expressly agrees that the notes for $9,000.00, hereinbefore required to be deposited with and held by the cashier of the Kanawha Valley Bank, shall be turned over by said cashier to the party of the third part, and canceled. If the said party of the first part shall after removing, return and live and reside within the said territory at any time within the five years next succeeding the date of this agreement, he agrees and binds himself to pay to the party of the third part as liquidated damages the sum of $15,000.00, and any notes heretofore required to be deposited with the said cashier, which may then remain in his hands, shall be turned over to the said A. L. Lawrence as a credit on the amount of such liquidated damages."

The declaration avers that S. G. Walker is a citizen of the state of Pennsylvania; that he has fully and in all respects complied with each and every provision of said agreement; that he had placed said notes in the hands of the Kanawha Valley Bank, to be held in accordance with the terms thereof, and to be paid and collected at the respective maturities of the notes; that when one of the notes, dated February 15, 1907, payable 11 months after date, for $2,000, became due and payable, according to the face and tenor thereof, it was duly presented for payment, and payment refused; and that by reason of the agreement mentioned each and all of the notes, upon failure of the payment of the one which first matured, became at once due and payable, without regard to the date of their maturity.

The only question for determination is whether the considerations mentioned in the judgment on demurrer and hereinabove specifically set forth are contrary to public policy. The record does not contain any opinion of the learned judge below, setting forth the reasons of his decision. One of the greatest jurists of our day, Jessel, M. R., said:

"The suit raises points of the very greatest importance as regards the general law, upon which I can give my opinion—and I say my opinion advisedly, because I am free to confess that the law is not so clearly settled on the point that the judge can lay down the law; he can only give his opinion of the law. Judicial opinion has varied a great deal, and must vary a great deal, when you consider the ground upon which that judicial opinion or those judicial opinions have been founded. This is a branch of the law which depends upon what is commonly called 'public policy.' Now, you cannot lay down any definition of the term 'public policy,' or say it comprises such and such a proposal, and does not comprise such and such another; that must be, to a great extent, a matter of individual opinion, because what one man, or one judge, may think against 'public policy,' another may think altogether excellent 'public policy.' Consequently, it is impossible to say what the opinion of a man or a judge might be as to what 'public policy' is."

By the ancient common law a man was not allowed to restrain himself by contract from exercising any lawful craft or business in his own way, and this doctrine is said to have grown out of the English law of apprenticeship, which forbade the exercise of any regular trade or handicraft except after a long apprenticeship and admission into some guild or company; but the changed conditions of society have greatly modified the old doctrine. Men are no longer required to follow a particular trade or calling, or run the risk of being without work, and thus becoming a burden on the public, and the reasons which underlay the old law no longer exist. So far as may be gathered from the best-considered cases, the rule now seems to be that if the purpose of the parties is not in itself unlawful, if it is not unreasonably injurious to the public welfare, and does not impose a heavier restraint than the interest of the complaining party requires, such agreements will be sustained. Chief Justice Tindal, in Horner v. Graves, 7 Bing. 743, lays down a rule which has met general acceptance:

"We do not see how a better test can be applied to the question, whether reasonable or not, than by considering whether the restraint is such as to afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party can be of

no benefit to either; it can only be oppressive, and if oppressive it is in the eye of the law unreasonable."

The agreement here relates to the sale of the liquor business in the county of Kanawha, and the seller agrees not to engage in a like business in the county of Kanawha, or the adjoining counties, for a period of six years, and, as additional assurance against his setting up a competitive business in that locality, he agrees to remove therefrom and to remain away for a period of five years. It is difficult to see how such a contract contravenes any principle of public policy. It may be a convenience to the public that the liquor business be carried on in any particular community; but it is not a public necessity, certainly not a necessity that it be carried on by any particular person. The public may prefer to deal with such person rather than with the party to whom he sells; but it is not obliged to do so, and. so long as the transaction falls short of a conspiracy to control prices by creating a monopoly, the public does not suffer; while, on the other hand, it would seem to be an unreasonable restriction to the freedom of contract, and an invasion of private right, if a party were precluded from selling his business at the best price by an agreement not to compete with the person to whom he sells. "Many of these partial restraints on trade," says Baron Parke in Mallan v. May, 11 Mees. & W. 652, "are perfectly consistent with public convenience, and the general interest, and have been supported, such as a case of the disposing of a shop in a particular place with the contract on the part of the vendor not to carry on a trade in the same place. It is in effect the sale of a good will and offers encouragement to trade by allowing a party to dispose of all the fruits of his industry." The laws relating to the sale of intoxicating liquors in West Virginia have not been brought to our attention, and we cannot assume that it is the public policy of that state to encourage or allow every one who chooses to engage in that business, and that agreements tending to restrict the number of persons so engaged are repugnant to public policy. In most of the states with whose laws we are familiar, heavy taxes and onerous conditions are imposed for the express purpose of limiting the number of those who shall sell intoxicating liquors. A contract like this, therefore, is not obnoxious to the objection that it tends to create a monopoly.

Judge Taft, in U. S. v. Addyston Pipe & Steel Company, 85 Fed. 272, 29 C. C. A. 141, 46 L. R. A. 122, reviews many of the cases on this subject, and says:

"For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements: (1) By the seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold; (2) by a retiring partner not to compete with the firm; (3) by a partner pending the partnership not to do anything to interfere by competition or otherwise with the business of the firm," etc., etc.

One of the leading American cases is Diamond Match Company v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464, where the court held valid the agreement of the defendant who had sold his match manufacturing business, with the good will, to a corporation then engaged in the same business, and covenanted with the purchaser

and its assigns not to engage within 99 years in the like business in any of the United States or territories, except Nevada and Montana.

In Oregon Steam Navigation Company v. Winsor, 20 Wall. 64, 22 L. Ed. 315, Mr. Justice Bradley says:

> "Cases must be judged according to their circumstances, and can only be rightly judged when the reason and grounds of the rule are carefully considered. There are two principal grounds on which the doctrine is founded that a contract in restraint of trade is void as against public policy. One is the injury to the public by being deprived of the restricted party's industry. The other is the injury to the party himself by being precluded from pursuing his occupation, and thus being prevented from supporting himself and his family. It is evident that both these evils occur when the contract is general not to pursue one's trade at all, or not to pursue it in the entire realm or country. The country suffers the loss in both cases, and the party is deprived of his occupation, and is obliged to expatriate himself in order to follow it. The contract that is open to such grave objection is clearly against public policy; but if neither of these evils ensue, and if the contract is founded on a valid consideration, and a reasonable ground of benefit to the other party, it is free from objection and may be enforced."

In Gibbs v. Baltimore Gas Company, 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979, the court held that combinations among those engaged in business impressed with a public or quasi public character, manifestly prejudicial to the public interest, could not be upheld, and that contracts which impose a restraint, though only partial, upon business of such character, would not be enforced, but it held that "where the public welfare is not involved, and restraint upon one party is not greater than protection to the other party requires, a contract in restraint of trade may be sustained."

In National Enameling & Stamping Company v. Haberman (C. C) 120 Fed. 415, Judge Platt, after tracing the history of the doctrine in an interesting opinion, holds that a restrictive covenant, unlimited as to time, covering the entire United States, being in part consideration of a payment for good will sold, is ancillary to the main lawful contract, and is reasonable, and no broader than is necessary to save the covenantee the rights and privileges for which he has paid, and may be enforced.

In the Third Edition of Pollock on Contracts, pp. 478, 479, may be found a list of the leading English cases between the years 1855 and 1899, in which restrictions were held reasonable.

In Nordenfelt v. Maxim Nordenfelt Company, [1894] App. Cas. 535, the extent of restriction in time was 25 years, and unlimited in space.

It would be useless to go further and to cite innumerable cases which hold that agreements for a consideration not to engage in a particular business for a limited time in a limited territory are not illegal or contrary to public policy. The territory embraced within the county of Kanawha and adjoining counties is not an unreasonable limitation of the space within which the plaintiff covenanted not to engage in business in competition with his vendee, nor is the period of six years an unreasonable time; but it is contended, with apparent seriousness, that Walker's agreement to remove from said territory within 60 days, and to live and reside outside of it for the period of

5 years, is "illegal and immoral," in view of the peculiar nature of the liquor business, and the question is asked on page 12 of the printed brief, submitted by defendant in error:

"Can we not assume, with such a remarkable provision, that Walker possessed some secret influence with relation to the liquor traffic, licenses, etc., that made it imperative for Walker to agree to leave the prescribed territory within 60 days before Lawrence would purchase the property?"

We must infer that Lawrence attached much consequence to the stipulation that Walker should not reside within the territory described, for it is expressly agreed that in case he failed to remove therefrom the $9,000 of notes should be canceled; but we fail to see wherein such an agreement is either illegal or immoral. It is a matter of common knowledge that within those communities where there are severe restrictions upon the liquor traffic there is much illicit business in liquors carried on by those who, in the parlance of the day, are called "blind tigers," and it may be that Lawrence suspected Walker of such dangerous proclivities, and believed that Walker's agreement not to compete within that territory would be more completely carried out if he removed therefrom. Without some proof, we could not say that this restraint is more extensive than was reasonably necessary for the protection of the vendee in the enjoyment of the business purchased. An agreement not to reside within a certain limited territory is not in itself illegal. It was so expressly decided in an early case in the Court of Exchequer (Dendy v. Henderson, 10 Ex. 194) Hurlstone and Gordon, which was an agreement between plaintiff, a solicitor, and the defendant, who was employed at a salary as a resident clerk, and the defendant agreed that he would not for the space of 21 years, notwithstanding the decease of the plaintiff, reside in the parish of Tormohan or St. Mary's Church, or within 21 miles thereof, or carry on therein or within the distance aforesaid, during the period of 21 years, any business of the description of that carried on under the agreement. The declaration on this agreement alleged as a breach that the defendant resided in the parish of T., and during said period of 21 years carried on business in the said parish of the description of that carried on under the agreement, and there was a plea that, although the defendant resided in the parish of T., yet he did not so reside for the purpose or with the intention of carrying on business of the description of that carried on under the agreement. It was held that the restriction was not unreasonable, and was good in law. Alderson, B., in the colloquy during the argument, as appears in the report, says:

"Is it clear that the protection of the plaintiff does not require that the defendant should not reside within the prescribed limits? The defendant must perform his agreement, unless he can clearly establish that the restraint is unreasonable."

Platt, B., says:

"The restriction as to residing within the particular distance seems to me a reasonable restriction in order to protect the other party."

Some stress is laid in the argument before us on the provision which appears in the contract of April 23d, whereby Lawrence sold the business to Walker, and it was agreed that Walker should promote the

177 F.—24

personal political ambitions of the said A. C. Lawrence. Agreements of that kind must necessarily receive judicial condemnation; but there is no such provision in the contract of June 26th, which is here sued upon. We have already stated the grounds upon which the court below sustained the demurrer, and the reasons that lead us to conclude that there was error in such ruling; but as one of the assignments of error goes to the general demurrer, and the defendant in error would be entitled to an affirmance if on the whole record the judgment of the court below was right, we have carefully considered the other grounds which were not specifically mentioned in the order of the lower court, and are of opinion that the demurrer cannot be supported. Much of the argument of the defendant in error is incomprehensible to us. It is said that "this transaction savours of a whisky combine," that the contracts show "efforts upon the part of the parties to traffic in whisky licenses, and public office, and so word the writing as to allow the considerations for these illegal proceedings to pass through a court of justice."

Two contracts appear in the record. In that of April 23d Walker sold to Lawrence and transferred his good will in the business sold, agreeing not to engage as a competitor therein of Walker, Watson & Clark for a period of six years in Kanawha county, with one exception, specified. In the contract of June 26th, which is here sued on, Walker sold his interest in the same business to Lawrence, agreeing not to compete with the parties to whom he sold in Kanawha and the adjoining counties for the period of six years, without any reservation, and to remove and live outside of that territory for the term of five years. The hidden motives which underlay these transactions are beyond our ken, and we do not know that such motives are the proper subject of judicial inquiry. The motives of covenantees are not the test of the validity of contracts. Agreements not to compete within a limited territory and for a limited period of time are admittedly not unreasonably injurious to the public welfare. The agreement on the part of the seller that he would remove from and reside outside of the territory named was apparently for the purpose of securing more complete compliance on the part of the seller with his promise not to compete with his vendee. It may be that this was a heavy restraint; but the seller has, according to the declaration, performed his agreement, and it does not lie with the purchaser, who imposed this condition, to complain of it. It was not an unlawful condition, and it is the duty of courts, wherever possible, to construe the contract to be valid rather than void. "If there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that contracts, when entered into freely and voluntarily, shall be held good and shall be enforced by courts of justice." Jessel, M. R., in Printing Company v. Samson, 19 Eq. Cas. 462.

The judgment of the court below in sustaining the demurrer is reversed.

Reversed.